UNITED STATES v. GRASS CREEK OIL & GAS CO. et al. *

(Circuit Court of Appeals, Eighth Circuit. October 13, 1916.)

No. 4704.

1. APPEAL AND ERROR ☞1009(4)—REVIEW—FINDINGS OF FACT—EQUITY CASES.
    Findings of fact by the chancellor, though not conclusive upon appeal, are presumptively correct, and unless clearly against the weight of the evidence, will not be disturbed, particularly where the testimony was given orally.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3974; Dec. Dig. ☞1009(4).]

2. MINES AND MINERALS ☞38(17)—PUBLIC MINERAL LANDS—RIGHTS OF OCCUPANTS—EVIDENCE.
    In a suit to oust defendants from possession of land, which had been withdrawn from entry under Pickett Act June 25, 1910, c. 421, 36 Stat. 847 (Comp. St. 1913, §§ 4523, 4524), evidence *held* to warrant a finding that at the time of the withdrawal defendants were in possession of the land.
    [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 103; Dec. Dig. ☞38(17).]

3. MINES AND MINERALS ☞2—PUBLIC MINERAL LANDS—RIGHT OF ENTRY—BONA FIDE CLAIMANTS—"DILIGENT PROSECUTION."
    Pickett Act June 25, 1910, authorizing the withdrawing of lands from mineral exploration and entry, provides that the right of any person, who at the date of any order of withdrawal is a bona fide occupant or claimant of oil or gas bearing lands, and who at such date is in diligent prosecution of work to the discovery of gas or oil, shall not be impaired by such order. Prior to the withdrawal of land from entry, a geologist and min-

ing engineer, as attorney in fact, had located claims thereon after doing some preliminary prospecting, and at the time the order was made defendants had possession of the land under a contract of lease, and were making preparations to drill for oil for commercial purposes, bringing their equipment thereon and holding possession of the land through a caretaker. *Held*, that where defendants continued in possession, drilled wells, and produced oil in commercial quantities, their rights in the land were not affected by the order of withdrawal, for they had possession while preparing their equipment, and were bona fide occupants in diligent prosecution of the work of discovery.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 2; Dec. Dig. ☞2.]

Appeal from the District Court of the United States for the District of Wyoming; John A. Riner, Judge.

Suit by the United States against the Grass Creek Oil & Gas Company and another. From a decree for defendants, the United States appeals. Affirmed.

This is an appeal from a decree in favor of the appellees, who were defendants in the court below. The complaint made a number of others than the appellees parties defendant, but the appellees were the only defendants who contested the action. The complaint seeks to oust the defendants from the possession of the northwest quarter and the east half of the southwest quarter of section 18, township 46 north of range 98 west, in the state of Wyoming.

It is charged that the lands are a part of the public domain and the title is in the United States; on May 6, 1914, the President of the United States, under the authority vested in him by the act of Congress of June 25, 1910 (36 Stat. 847, c. 421 [Comp. St. 1913, §§ 4523, 4524]), known as the "Pickett Act," withdrew these lands from mineral exploration and from all forms of location, settlement, selection, filing, entry, patent, or disposal under the public land laws of the United States; that since then these lands have not been subject to occupation or exploration for petroleum, or mineral oil, or gas, under the public land laws of the United States; that on or about the 20th day of July, 1913, one Thomas S. Harrison, styling himself attorney in fact for a number of parties, joined as defendants, caused to be filed for record and recorded upon the records of Hot Springs county, Wyo., the county in which these lands are situated, certain paper writings In the names of these parties, purporting to be location certificates, evidencing the claim and location by them of said lands, as petroleum placer mining claims, under and pursuant to the mining laws of the United States; that on the 5th day of May, 1914, one C. C. Worland caused to be filed similar papers for certain parties named and joined as defendants in this action, also covering the lands in controversy, as did the Harrison location papers; that by certain instruments of writing these Harrison claims were transferred and assigned to the defendants; that none of the defendants, nor any other person, had discovered petroleum or mineral oil or gas or other minerals in or on said lands, or any part thereof, on or before the 6th day of May, 1914; that none of the defendants, nor any other person, was on or prior to the said 6th day of May, 1914, the bona fide occupant or claimant of said lands, and that none of said defendants, nor any other person, was on said 6th day of May, 1914, in the diligent prosecution of work leading to the discovery of oil or gas on said lands, or continuing thereon in diligent prosecution of such work; that on or about the 24th day of July, 1914, and 24th day of August, 1914, the defendant Ohio Oil Company was a trespasser on said lands, engaged in drilling wells thereon, produced petroleum or mineral oil thereon, and since then has extracted petroleum or mineral oil and gas, the exact amount whereof is to the plaintiff unknown; that subsequent to said 6th day of May, 1914, the defendants, and particularly the Ohio Oil Company, in defiance of said order of withdrawal, and in violation of the proprietary and other rights of plaintiff, unlawfully entered and trespassed upon said lands and, continuing, asserted title thereto; that the said Ohio Oil Company has wells, together with certain mining property, machinery,

tools, and fixtures necessary to the operation of said oil wells on said land and drilled as alleged; that the other defendants claim some right or title to the said lands; that all of said pretended petroleum placer mining claims are null and void, and of no effect. The prayer of the bill is that said lands be declared to have been, from and after the said 6th day of May, 1914, lawfully withdrawn from mineral exploration and all forms of location, settlement, etc.; that the defendants be adjudged to have no estate, right, title, or interest thereto; that they be enjoined from asserting or claiming any right, title or interest in and to said lands, and from trespassing thereon; that an accounting be had; and that the plaintiff have a decree for the value of the oil thus unlawfully taken.

The answer of the Ohio Oil Company alleges that on the 27th day of August, 1913, the said Thomas S. Harrison, as attorney in fact for the parties named in the bill, caused to be filed and recorded on the records of the county of Hot Springs, in the state of Wyoming, notices of locations, showing the locations to have been made on the 20th of July, 1913, by the said locators; that it was done in accordance with the mining laws of the United States, for placer mining claims then and there located and claimed for mineral oil; that this defendant and its codefendant, the Grass Creek Oil & Gas Company, claim title to said lands; that this defendant has thereon two wells, together with certain mining property, machinery, tools, and fixtures, for the operation of said oil wells so drilled. It then denies all other allegations of the bill, and sets up as further defense that prior to the 20th day of July, 1913, the lands in controversy were public lands, unoccupied, vacant, and unclaimed, and subject to location and sale under the mining laws of the United States; that on said day said lands were taken possession of, and located under the said mining laws, as petroleum oil placer mining claims, by S. L. Wiley, S. A. Lane, R. W. Harrison, D. A. Ehrlich, R. S. Green, Ed. M. Harrison, W. O. Sanzenbacher, and Pauline Harrison, all of whom were then and there citizens of the United States and duly qualified under the mining laws to locate and purchase lands of the United States containing minerals; that the northwest quarter of section 18 was so located as the "Meeteetse No. 4 Oil Placer Mining Claim," and the east half of the southwest quarter of said section 18 as the "Meeteetse No. 15 Oil Placer Mining Claim"; that immediately after these persons had taken possession of these lands they caused work to be done and performed upon each of the said mining locations for the purpose of discovering and developing the mineral upon each thereof; that by reason of such work petroleum mineral oil was discovered on each of said claims prior to October 1, 1913; that for some time prior to and on the 6th day of May, 1914, and continuously thereafter, the defendant was on said lands in diligent prosecution of work leading to the discovery of oil in commercial quantities, being then and there a bona fide occupant and claimant of said lands, and that such subsequent work and labor, done by the defendant on behalf of said locators and as their lessee, developed petroleum oil on each of said claims in commercial quantities; that the said locators have transferred their interest in full compliance with the local laws, the laws of the United States and of the state of Wyoming, as hereinafter more fully stated; that on the 16th day of June, 1914, in pursuance of an oral contract previously entered into by and between the owners and the Ohio Oil Company, under which it had taken possession before May 6, 1914, made a written lease for the northwest quarter of section 18, located as the "Meeteetse No. 4 Oil Placer Mining Claim," and said Ohio Oil Company has been in possession ever since the oral contract for said lease was made; that on the 16th day of June, 1914, the locators executed a lease to one B. H. Hopkins for the east half of the southwest quarter of said section 18, which is known as the "Meeteetse No. 15 Oil Placer Mining Claim," which lease was on the 17th day of June, 1914, assigned by said Hopkins to the Midwest Refining Company, and on August 27, 1914, the Midwest Refining Company, for value assigned and transferred all its right, title and interest to this tract to the Ohio Oil Company, that on July 24, 1914, said locators by deed conveyed all their right, title and interest to its co-defendant, the Grass Creek Oil & Gas Company, which now is the owner thereof, and this defendant its lessee.

The answer of the Grass Creek Oil & Gas Company is practically the same as that of the Ohio Oil Company.

The final hearing was on oral testimony, and the court found both issues in favor of the defendants, that of the discovery, and that the defendants on May 6, 1914, were bona fide occupants and claimants of these lands, in the diligent prosecution of work leading to the discovery of oil, and continuing thereafter in diligent prosecution of said work. From this decree the United States prosecutes this appeal.

F. P. Hobgood, Jr., Sp. Asst. Atty. Gen. (C. L. Rigdon, U. S. Atty., of Cheyenne, Wyo., on the brief), for the United States.

William A. Riner, of Cheyenne, Wyo. (Timothy F. Burke, of Cheyenne, Wyo., on the brief), for appellees.

Before SANBORN and CARLAND, Circuit Judges, and TRIE-BER, District Judge.

TRIEBER, District Judge (after stating the facts as above). Under the issues and proofs two questions arise. First. Was there a discovery of mineral oil by the defendants or those under whom they claim, on the lands in controversy, on or before the 6th day of May, 1914, when the withdrawal order of the lands was made by the President? Second. Were the defendants at the date of said order of withdrawal bona fide occupants or claimants of these lands, engaged in diligent prosecution of work leading to the discovery of oil, and continuing thereafter in diligent prosecution of said work, until oil was discovered?

[1] In view of the conclusions reached, we deem it unnecessary to determine the first issue, as a finding in favor of the defendants on either issue must result in the affirmance of the decree. It is a well-settled rule governing appellate courts that the findings of fact by a chancellor, although not conclusive upon appeal in equity, are presumptively correct and persuasive. Unless an error has occurred in the application of the law, or a serious mistake has been made in the application of the evidence, or the finding is clearly against the weight of the evidence, such findings will not·be disturbed. And this rule is especially applicable when the evidence was heard orally by the chancellor, and he thus had the opportunity to see the witnesses, observe their demeanor while testifying, judge of their candor and intelligence, and thus be able to determine their credibility and the weight to be given to their testimony. Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447; Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; Mastin v. Noble, 157 Fed. 506, 85 C. C. A. 98; Harper v. Taylor, 193 Fed. 944, 113 C. C. A. 572; United States v. Marshall, 210 Fed. 595, 127 C. C. A. 231; Tobey v. Kilbourne, 222 Fed. 760, 138 C. C. A. 308. The new equity rules have made no change in these respects. American Rotary Valve Co. v. Moorehead, 226 Fed. 202, 141 C. C. A. 129.

[2, 3] The act of Congress under which the withdrawal of these lands was made by the President on May 6, 1914, is known as the "Pickett Act," passed June 25, 1910 (36 Stat. 847, c. 421). That act, so far as it applies to the issues in this case, contains the following proviso:

"Provided, that the rights of any person who, at the date of any order of withdrawal heretofore or hereafter made, is the bona fide occupant or claimant of oil or gas bearing lands, and who, at such date. is in diligent prosecution of work leading to discovery of oil or gas, shall not be affected or impaired by such order, so long as such occupant or claimant shall continue in diligent prosecution of said work."

As it is claimed on behalf of the appellant that the finding of the trial judge was not warranted by the evidence, and that he committed obvious errors in the application of the law, it becomes necessary to review the evidence. As we deem it unnecessary to determine the correctness of the finding on the first issue, that of the discovery of oil in 1913, we shall confine ourselves to the statement and consideration of the evidence relating to the other issue. Most of the facts on this issue are undisputed and not questioned by either party.

As early as April, 1913, Mr. Harrison, a geologist and mining engineer, visited this section, now known as the "Grass Creek oil field"; that in July, 1913, he employed a civil engineer to locate the lands according to the government surveys; that thereupon he located a number of mineral claims as attorney in fact for certain parties, all of whom were qualified to make the locations, among them the lands in controversy. He placed proper location notices on the land, had the location notices properly recorded in conformity with the laws of the United States, of the state of Wyoming, and the rules of miners in that section. He established camps, and drilled for oil on these lands, continuing until September, 1913, when it is claimed oil was discovered. He thereupon sought to obtain the necessary capital to develop these locations. In April, 1914, he showed these lands to representatives of the defendant the Ohio Oil Company, with a view of leasing them to it, indicating to them what he called the "discovery holes," which he had caused to be drilled in 1913. On April 19, 1914, he entered into an oral contract for the lease of these lands to the Ohio Oil Company, the agreement being made with Mr. McFadyen, who was field superintendent of the Ohio Oil Company. This agreement was made subject to the approval of the officers of the company. A few days thereafter, in April, 1914, this approval was obtained by telegraphic communication, whereupon Mr. McFadyen at once entered upon the lands and placed in charge thereof, as caretaker, one Virgil Jackson, who remained on the land as the employé of the Ohio Oil Company as caretaker from that time until after May 6, 1914. On May 4, 1914, Mr. McFadyen ordered the lumber and material, which was owned by the Ohio Oil Company and suitable for developing the land for oil, which was then in the town of Casper, to be sent immediately to Kirby, which is the nearest railroad station to these lands. On May 5, 1914, Mr. Harrison returned to these lands, bringing with him tent equipments for the accommodation of the workmen, and which were immediately put up. On the same day, May 5, 1914, Mr. McFadyen, for the Ohio Oil Company, entered into a verbal contract with Mr. Good, at Thermopolis, to drill wells on these lands, and to proceed at once. Mr. Good shipped the drilling tools to the land on May 9, 1914, for the purpose of doing the work, and continued uninterruptedly until Oc-

tober 1, 1914. He began actual drilling operations on the northwest quarter on July 1, 1914, as soon as the drilling apparatus had been erected and was in working order, finishing the well on July 24, 1914, when, having drilled to a depth of 1,047 feet, oil in commercial quantities was discovered. Actual drilling on the east half of the southwest quarter was begun by him on July 31, 1914, and continued until August 20, 1914, when oil was discovered in commercial quantities at the depth of 965 feet.

On May 6, 1914, Mr. Harrison found some persons on these lands, who claimed to be locators under what is known as the Worland locations; but he treated them as trespassers and compelled them to leave, which they did. In this connection it is proper to state that these Worland locators, although made parties defendant to this action, made no defense whatever, nor any claim to the lands by cross-complaint against appellees, thus abandoning any claim which they may have had to the land in controversy, and by implication, at least, recognizing the superior rights of the Harrison locators, under whom appellees claim. On the same day Mr. Harrison made contracts for supplies to be used in connection with the work of drilling for oil. An engineer of the Ohio Oil Company arrived on that day with a carpenter, who started the work of building the camps on that day and continued until they were completed. Tents were also put up on that day. In the meantime Mr. McFadyen was looking after the prompt loading and forwarding of the Ohio Company's rigs, which had been ordered to be forwarded to the land.

Prior to May 6, 1914, the Ohio Oil Company had expended in money and assumed liabilities under its contracts for work on the land, amounting to $2,000. The material and lumber for the camps arrived on May 7, 1914, and work was begun at once. On May 10, 1914, the cook house had been completed, and the car containing the equipment reached the railroad station nearest to these lands, and was placed on the siding for unloading. Knowledge of the withdrawal order did not reach the parties until May 14, or 15, 1914. Since then the Ohio Oil Company has expended for the development of these two tracts of land large sums of money; on the northwest quarter $11,-157.92, and on the other tract $10,152.97. Thereafter and before the institution of this suit there was spent by the Ohio Oil Company $629.36 in operating the wells and $15,000 for the construction of a 37,500-barrel steel storage tank. These sums do not include the expenditures made by Mr. Harrison prior to his contract with the Ohio Company.

There was evidence introduced on the part of the government that on May 5, 1914, a Mr. Walker went on the land with a party of prospectors, and he did not see any work under way, that at a few points he found some three-inch pieces of pipe and a drill hole on each of the quarters. A Mr. Orchard, another witness for the government, testified that he went on these lands March 25, 1914, and saw no improvements, except a few pieces of pipe sticking out of the ground. Mr. Valentine, another witness for the government, testified that he was on these lands on May 5, 1914, and saw no one there, but saw a

piece of pipe sticking out of the ground on the southeast quarter, but nothing on the northwest quarter.

In our opinion the evidence clearly justified the finding by the chancellor that, from the time Jackson was employed and placed on the land as caretaker for the defendant, the Ohio Oil Company was an occupant of the land.   But it is claimed that, even if that is true, the defendant the Ohio Oil Company was not a bona fide occupant or claimant of these lands, in the diligent prosecution of work leading to the discovery of oil or gas on May 6, 1914, when the order of withdrawal was made.   It is claimed that actual drilling operations were not commenced until July 1, 1914, on the northwest quarter, and on July 31, 1914, on the east half of the southwest quarter, and that until the actual drilling was begun there was no prosecution of work within the meaning of the act of Congress.

We are of the opinion that this is too narrow a view to take of this statute.   The enactment of this proviso by Congress could have had but one object in view, and that was to protect the rights of all persons who, at the date of an order of withdrawal, are occupying or claiming oil-bearing lands in good faith, for the purpose of acquiring them under the laws of the United States, and are diligently prosecuting the work leading to the discovery of oil.   Before the enactment of this statute discovery of the mineral was essential to make a location.   As frequently, in fact in most instances, prospecting was necessary in order to determine whether oil or gas are on the public lands, and large sums of money were necessarily expended to ascertain this fact, Congress by this proviso in the act of 1910 extended its protecting arm to those acting in good faith in an effort to ascertain whether there was oil or gas under them.   In our opinion, when a citizen of the United States, in good faith enters upon public land for the purpose of discovering oil or gas, takes possession of the land by placing a caretaker thereon while he is taking proper steps to obtain the material necessary for the work of constructing the camps, enters into contracts for drilling, acting as expeditiously as possible in erecting camps and preparing for the drilling, spends money and enters into contracts whereby he becomes liable for sums of money to prosecute the work leading to the discovery of oil or gas, and as soon as it is possible, by the exercise of proper diligence, begins the work of drilling, and continues it diligently and expeditiously until oil is discovered in commercial quantities, he is within the protection of this proviso.   As was stated in Borgwardt v. McKittrick Oil Co., 164 Cal. 650, 130 Pac. 417; although that case did not involve this act of Congress, but was a contest between claimants:

"We do not mean to hold that such diligent prosecution of the work may not include such actual preparation for the same as the bringing to the claim of the materials necessary therefor."

The learned counsel for the government in fact concedes the correctness of this proposition.   In his brief he says:

"It is not contended by the government that the construction of a camp might not be a part of such work, but that, unless such camp is for the purpose

of furnishing a base for drilling operations upon the claims in controversy, its construction is not diligent prosecution of work, so far as the claims in controversy are concerned."

The evidence clearly shows that the defendants brought themselves within this rule. Everything they did was "for the purpose of furnishing a base for drilling operations on the lands in controversy." For what other purpose did they make these expenditures, and enter into contracts for erecting the camps, and the drilling by Mr. Good? The learned trial judge committed no error in the application of the law to the facts, as shown by the evidence, and the evidence sustains his findings beyond question.

The decree of the District Court is affirmed.