[L. A. No. 15675.  In Bank.—May 20, 1937.]

B. M. HOPPER, Plaintiff and Appellant, v. AMOS W. EL-
LIOTT et al., Respondents; COALINGA–KETTLE-
MAN OIL COMPANY (a Corporation), Intervener and
Appellant.

David Peckinpah, W. H. Metson, C. F. Rafferty and A. H. Ricketts for Plaintiff and Appellant.

Randolph V. Whiting, Henry F. Wrigley and John F. Pryor for Intervener and Appellant.

A. L. Weil, P. C. Black, L. R. Martineau, Jr., Warren Stratton, George W. Nilsson and John G. Covert for Respondents.

THOMPSON, J.—The plaintiff is one of eight persons who on the tenth day of September, 1909, posted notice of a placer mining location on the northwest quarter (N. W. 1/4) of section two (2), township twenty-two (22), south range seventeen (17) E. M. D. M., and being 160 acres of the public domain in the Kettleman Hills district. A copy thereof was recorded in the office of the county recorder of Kern County on the twenty-eighth day of November, 1909, which was one day after the President of the United States made his order withdrawing the lands from entry. This action was commenced for the purpose of quieting plaintiff's title to the property against the claims of the defendants. The complaint in intervention alleges that the intervener Coalinga-Kettleman Oil Company has succeeded to the title to the oil placer location and it is prayed that its title thereto be quieted. However, it should be observed at this juncture that there was in truth no conflict between intervener and plaintiff, the contest being between plaintiff and intervener, on the one side, and the defendants on the other. Judgment was rendered after trial in favor of the defendants and the plaintiff and intervener prosecute this appeal therefrom.

While the case is interesting, the salient facts are not complicated. Following recordation of the notice of location and in the spring of 1910, the locators quitclaimed their

interests .to the Echo Oil Company, in which the locators were interested, which company entered into a drilling contract with the K. H. Oil Company, whereby the Echo Oil Company deposited a deed to the property in escrow to be delivered to the K. H. Oil Company when it should have drilled a well to a depth of 4,000 feet "unless oil in paying quantities" were discovered "at a lesser depth". The K. H. Oil Company assigned its interest in the contract to the intervener about the month of June, 1910. Lumber for a derrick was hauled in commencing in March of 1910, but the well was not spudded in until some time in June of that year. Drilling proceeded until a depth of about 4,000 feet was reached about August, 1911, when operations ceased. Somewhere between six and nine months thereafter drilling was resumed and the hole carried down to a depth of 4,812 feet, which occurred during the early part of 1913. At that time the work was stopped, the casing was taken out of the hole; the derrick, boilers and engine were taken down and the pipe and other materials hauled away. No more work of any kind was done by the appellants, or either of them.

However, on February 25, 1920, the Federal Leasing Act (30 U. S. C. A., sec. 228) became law, and during April or May of that year the respondent Elliott made application for an oil and gas prospecting permit, which was granted October 30, 1920. Elliott assigned his permit to the Coast Land Company, which company assigned to the Marland Oil Company. Oil was discovered in 1928, at a depth of about 7,000 feet. In 1929 the government issued leases to the Marland Oil Company covering this and additional property. These leases subsequently came into the hands of Continental Oil Company by assignment. At the time of the trial nine wells had been drilled on the property covered by the Elliott permit, and there had been expended on the quarter section involved for drilling operations something in the neighborhood of $400,000.

This action was commenced in the early part of 1932, or about 19 years after appellants walked off the property in 1913. The case was tried in 1933 and the court made its findings by which it declared (stated briefly) that appellants were not engaged in any work on the land at the time of the withdrawal thereof from entry by the President of the United States; that appellants have not performed any assessment

work on the property since 1913, and they failed to make discovery of petroleum oil or other valuable minerals within the property; that leases from the United States Government came into the hands of the Continental Oil Company, as outlined above; that the deed executed by Echo Oil Company to the K. H. Oil Company and placed in escrow as already recited was never delivered to either the K. H. Oil Company or to the Coalinga-Kettleman Oil Company, and "that in the spring of 1913 said Coalinga-Kettleman Oil Company, having failed to discover oil, abandoned said well, removed its derrick, pulled and sold its casings, and completely abandoned said placer mining claim and property and thereafter permitted its corporate records to become lost and its corporate charter to lapse and sat by for approximately nineteen years, making no claims to said property until after the same had been developed at the expense of the defendants herein"; that the United States has an interest in the lands, both as owner of the fee and as lessor in the leases mentioned, and is not made a party to the action, and that the defendant Kettleman North Dome Association is in possession by virtue of an agreement between the owners and operators of property in the north dome of Kettleman Hills providing for unit operation thereof.

The various claims and arguments of appellants may be stated as follows: That they had a valid mining claim upon which they were diligently at work at the time of the withdrawal order and at all times thereafter; that all property covered by valid and subsisting claims was excluded from the prospecting permits; that the United States Government could not lawfully include property so covered by the leases; that advantage may not be taken of their failure to do assessment work commencing in 1913 by anyone other than a relocator; and that the property was not in fact abandoned, but in truth oil was discovered and their right to the property perfected thereby.

It becomes immediately apparent that if the finding of the court to the effect that there was no discovery, or the one that the property was abandoned or one to the effect that the United States is a necessary party, is supported by the evidence the judgment must be affirmed. Our conclusion is that not only must the judgment be affirmed because these findings are supported, but also for other reasons which we shall mention hereafter.

It is a conceded fact that the oil producing formation in the Kettleman Hills district is the Temblor or Vaqueros stratum which, at the place where the well of appellants was drilled, is about two thousand feet below the deepest point reached by them, and also that appellants never did attempt to put the hole they drilled on production. Witnesses for the appellants testified to gas pressure and to oil scum on the water and to oil markings on the derrick and to oil stain discoverable by an ether bath on the sand which came from the bailer. One witness for plaintiff testified on cross-examination that after the mud and other fluid had been going into the sump for two or three weeks he supposed "if you whipped it all up you would have a couple of barrels of oil, whipped it out of the mud so it would come up and you could work it". Another witness on cross-examination stated: "Sometimes after we tried to bail the well down, that is taken the water [test] out, sometimes there would be quite a little bit, maybe a couple of barrels in the sump hole, and sometimes you could hardly see any at all." While another witness, a geologist, gave it as his opinion that had the well been put on production it would have produced about one hundred barrels of oil per day, yet this witness in 1921 made an affidavit in support of the application of the K. H. Oil Company, the parent company of the Coalinga-Kettleman Oil Company, in which it was stated in pursuance of the provisions of the Leasing Act that "The affiant had previously performed all acts on said land as a mining claim except to make discovery and that discovery had not been made on said lands prior to the passage of said Act of Congress." This same witness in a report rendered by him in 1930 in referring to the well drilled said: "Because of the inadequacy of the machinery then in use in drilling work it was impossible to go more than 5000 feet, so that efforts to reach the oil zone at that time were futile." Other similar statements of this witness were introduced. Another witness who testified for plaintiff to the effect that there were showings of gas and oil admitted that in 1915 or 1916 he gave testimony to the effect that they never got a trace of oil. But above all is the fact that in 1913 the appellants dismantled the property, removed those things which were apparently of value and walked off the property. The defendants not only produced evidence establishing beyond doubt that the Vaqueros formation is the

producing one in the district, but also introduced the testimony of experts to the effect that no estimate of any value can be made of the probable productivity of a well other than by an actual production test, for the reason that organic materials are widely distributed and laid down in nearly all sedimentary beds, as a result of which, when in drilling such a bed is penetrated, the driller will get some showing of gas and small quantities of oil, but the concentration of hydrocarbons resulting from the distilled organic material so as to form an oil field or pool is relatively rare. The question at this juncture is: Does the evidence support the finding that there was no discovery?

Before an answer may be properly given we must first dispose of appellants' contention that belief in the existence of oil under the surface of the lands is substituted for the knowledge required in lode claims. The origin of what we consider a misapprehension of the law by appellants lies in the protection which must be afforded the *bona fide* locators of oil property during that period when they are diligently at work in an effort to make discovery. (See *McLemore* v. *Express Oil Co.*, 158 Cal. 559 [112 Pac. 59, 139 Am. St. Rep. 147], and *Borgwardt* v. *McKittrick Oil Co.*, 164 Cal. 650 [130 Pac. 417].) But the protection of this *inchoate* location made upon reasonable belief is no precedent or premise from which to argue that discovery may consist of a reasonable belief in the presence of oil underneath or within the land thus located. A reading of the opinion in *Miller* v. *Chrisman*, 140 Cal. 440 [73 Pac. 1083, 74 Pac. 444, 98 Am. St. Rep. 63], and *Chrisman* v. *Miller*, 197 U. S. 313 [25 Sup. Ct. 468, 49 L. Ed. 770], demonstrates that in so far as what constitutes discovery is concerned the test with regard to oil placer locations is not different from that of the lode location. In the last-mentioned opinion the Supreme Court of the United States said, after quoting the general rule from *Iron Silver Min. Co.* v. *Mike & Star etc. Co.*, 143 U. S. 394 [12 Sup. Ct. 543, 36 L. Ed. 201] : ''There was not enough in what he claims to have seen to have justified a prudent person in the expenditure of money and labor in exploitation for petroleum. It merely suggested a possibility that the ground contained oil sufficient to make it 'chiefly valuable therefor'.'' (See, also, *United States* v. *McCutchen*, 238 Fed. 575–590.) We have found nothing in the authorities

relied upon by appellants changing or altering the definition of discovery as applied to oil. Those cases which deal with actions commenced by the United States to set aside grants of agricultural land because of the belief of the patentee that they were in fact oil-bearing lands are obviously not persuasive here.

Reverting, therefore, to the question, it seems to follow that the court was amply justified in finding that there was no discovery tested by the rule that the mineral must be found in such quality and quantity as to inspire a person of ordinary prudence in the further expenditure of his labor and means. At this juncture it is pertinent to again ask if oil of such quality and quantity were discovered, why did appellants leave the property to again revert by natural processes to its virgin state?

In natural order we may briefly discuss whether the evidence was sufficient to support the finding of abandonment. It is not necessary to go into details. The evidence establishes that after the work was stopped the casing was pulled, the derrick dismantled and the boilers, engine and pipe hauled away. No further work was done on the property. In fact, appellants did nothing until preparations were made to file this action. It cannot seriously be contended that such testimony is insufficient to support the finding. But assuming the merit of such a plan for a moment: The Pickett Act (43 U. S. C. A., sec. 142), which confirmed and approved withdrawal of public lands from oil entries provided that it should not affect *bona fide* occupants or claimants of oil or gas-bearing lands who at the date of the withdrawal order were diligently prosecuting work thereon ''so long as such occupant or claimant shall continue in diligent prosecution of said work''.

In the absence of a sufficient discovery to validate the location and assuming contrary to the finding that there was no abandonment in the strict sense of the term, it cannot be denied that appellants did not continue in the diligent prosecution of work subsequent to 1913 and any rights theretofore existing lapsed under the provisions of the act just quoted. (See discussion in *United States* v. *McCutchen, supra,* and *United States* v. *Chanslor-Canfield Midway Oil Co.*, 266 Fed. 142.)

 Perhaps our treatment of the case might properly terminate at this point, but the respondents contend, and the court found, that the United States was a necessary party. Very recently the District Court of Appeal passed upon this question in the case of *Livermore* v. *Beal,* 18 Cal. App. (2d) 535 [64 Pac. (2d) 987], and we are in accord with what was said in that opinion. No other points require decision.

Judgment affirmed.

Shenk, J., Curtis, J., and Seawell, J., concurred.

Langdon, J., concurred in the judgment.

Rehearing denied.